Matter of Hogan (2023 NY Slip Op 00612)

Matter of Hogan

2023 NY Slip Op 00612

Decided on February 3, 2023

Appellate Division, Fourth Department

Per Curiam

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 3, 2023
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: WHALEN, P.J., PERADOTTO, NEMOYER, WINSLOW, AND MONTOUR, JJ. (Filed Dec. 30, 2022.)

&em;

[*1]MATTER OF COREY J. HOGAN, AN ATTORNEY, RESPONDENT. GRIEVANCE COMMITTEE OF THE EIGHTH JUDICIAL DISTRICT, PETITIONER.

OPINION AND ORDER
Order of suspension entered.
Per Curiam
Opinion: Respondent was admitted to the practice of law by this Court on March 7, 1975. During the time period relevant to this matter, respondent maintained an office for the practice of law in Amherst as the sole owner of the law firm Hogan Willig, PLLC (Hogan Willig). The Grievance Committee has filed a petition alleging against respondent a single charge of professional misconduct, which includes allegations that he engaged in several conflict of interest transactions with certain clients and failed to adequately communicate to the clients the scope of the representation and the basis or rate of the fee for which the clients would be responsible. Respondent filed an answer denying material allegations of the petition, asserting affirmative defenses, and raising various matters in mitigation, whereupon this Court appointed a referee to conduct a hearing. Prior to the hearing, however, the parties executed a stipulation resolving almost all outstanding issues of fact underlying the allegations of misconduct set forth in the petition. The Referee thereafter held a hearing wherein testimony was received from several witnesses, including respondent, and the Referee has filed a report containing findings of fact and an advisory determination sustaining the disciplinary rule violations cited in the petition. The Grievance Committee moves for an order confirming the report of the Referee and imposing upon respondent public discipline, and respondent opposes the motion and submits matters in mitigation. On October 25, 2022, counsel to the parties appeared before this Court for oral argument of the motion to confirm, at which time respondent was afforded an opportunity to be heard in mitigation.
The Referee found that, in February 2015, respondent and Hogan Willig agreed to represent a father and son and their limited liability company (collectively, clients) in relation to various issues arising from financial difficulties experienced by the clients' family farming business. The record reflects that the clients' primary objective was to refinance their existing debt. The Referee found that respondent and the clients executed a retainer agreement providing, inter alia, that Hogan Willig would perform various services, including analyzing the clients' current financial condition, providing assistance with refinancing the clients' existing debt, and defending against the claims of various creditors. The retainer agreement further provided that the clients would be billed on an hourly basis at a rate of $110 to $350 per hour, depending on the Hogan Willig personnel performing the work, and, although Hogan Willig would not require a retainer payment, it was expected that any fees for services rendered and disbursements made on behalf of the clients would be paid from refinancing of the clients' debt, their current receivables from farming operations, or revenue from future crop sales.
The Referee found that, from February 2015 until the lawyer-client relationship ended in or around May 2017, respondent and other Hogan Willig personnel provided to the clients various services, including determining the accurate amount of the clients' total outstanding debt, negotiating with creditors, making installment payment arrangements with certain creditors, defending the clients in creditor lawsuits, and providing legal advice about how to proceed.
The Referee also found that, shortly after the retainer agreement was executed, Hogan Willig began providing to the clients, at the direction of respondent, additional services that the Grievance Committee alleges constitute "farm management services," rather than legal services. The Referee found that such additional services included assistance with collection of receivables from crop sales, payment of bills, marketing of farm products, coordinating digital mapping of farm fields, frequent contact with the clients and their customers regarding the sale of farm products, and bookkeeping and accounting services, including implementation of a computerized accounting system. The Referee found that, for those additional services, Hogan Willig recorded in its computerized time-keeping system the number of hours worked by Hogan Willig personnel and amounts owed by the clients based on the hourly billing rates specified in the retainer [*2]agreement, i.e., $110 to $350 per hour, depending on the Hogan Willig personnel performing the work.
The Referee found that respondent did not adequately explain or communicate to the clients that the billing rates applicable to the services specified in the parties' retainer agreement would apply to the above-referenced additional "farm management" services, nor did respondent provide to the clients a revised retainer agreement addressing the issue. The Referee made an advisory finding that, therefore, respondent did not adequately communicate to the clients the scope of the representation or rate of the fee for which the clients would be responsible. The Referee also made an advisory finding that neither respondent nor Hogan Willig advised the clients in writing that certain services provided by Hogan Willig were not legal services and, therefore, the clients reasonably believed that any nonlegal services provided by respondent or Hogan Willig were the subject of the client-lawyer relationship (see generally Rules of Professional Conduct [22 NYCRR 1200.0] rule 5.7 [a]).
The Referee found that Hogan Willig's computerized time-keeping records show that, from February 2015 through June 2017, respondent and other Hogan Willig personnel recorded approximately 3,364 hours worked on behalf of the clients, resulting in fees in the total approximate amount of $687,320. The Referee found that, as of the date of the hearing, the clients have not paid any of the fees to Hogan Willig, nor has Hogan Willig demanded payment or sought to collect payment of the fees.
In addition to the issue regarding whether respondent adequately communicated to the clients the scope of the representation or rate of the fee, the Grievance Committee alleges that respondent engaged in various conflict of interest transactions with the clients, which appear to have been prompted by serious financial difficulties reported by the clients shortly after the clients retained Hogan Willig.
The Referee found that, at the outset of the representation, the clients had provided to Hogan Willig financial information that substantially overreported the clients' assets and underreported their debts. The Referee also found that, within a few weeks or less after the retainer agreement was executed, the clients advised respondent and others at Hogan Willig that an imminent cash flow crisis jeopardized the continued viability of their farming operations.
The Referee found that respondent thereafter arranged for the clients to begin to receive financial assistance in the form of "advances" of funds, the majority of which were used to pay expenses associated with operation of the clients' farming business, including the purchase of supplies such as fuel, fertilizer, seed, and equipment parts, and the payment of other expenses such as trucking costs, wages for farm employees, insurance premiums, land lease payments, and owners' draws paid to the clients. The Referee found that certain of the advances of funds were used to pay marketing costs, delinquent balances on debt owed to vendors and creditors of the clients, disbursements associated with lawsuits in which Hogan Willig was representing the clients, and a limited amount of personal expenses of the clients. The Referee found that the sources of the advances of funds made to or on behalf of the clients were respondent's personal funds, Hogan Willig's credit card accounts, Hogan Willig's operating account, and a limited liability company that was created, solely owned, and funded by respondent (respondent's LLC).
With respect to respondent's LLC, the Referee found that respondent formed the entity in April 2016 and, due to the clients' poor credit history, respondent arranged for it to purchase supplies and services on behalf of the clients so that vendors would not be engaging in transactions directly with the clients. The Referee found that, in addition to providing advances of funds used to purchase supplies and services, respondent's LLC purchased 11 pieces of farming equipment for the clients to use during the 2016 harvest season, without charge at the time. The Referee found that, although respondent expected that the clients would purchase the farming equipment or lease it after the 2016 harvest season, neither of those events occurred.
The Referee found that, from 2015 through 2017, respondent, Hogan Willig, and respondent's LLC made payments to, or on behalf of, the clients on approximately 450 occasions and in the total approximate amount of $638,543. The Referee found that cash flow statements for the clients' farming business pertaining to those years that were prepared by Hogan Willig referred to the advances of funds as "cash infusion" or "due to Hogan Willig." The Referee also [*3]found that certain of the advances of funds, in the total approximate amount of $148,110, were repaid during the course of the representation using revenue from the clients' farming operations, with respondent or Hogan Willig controlling the timing and amounts of the repayments.
With respect to the advances of funds, the Referee found that the clients were not provided with any promissory notes, loan documentation, or other writings evidencing the amount of funds advanced or the terms of repayment pertaining thereto. With respect to the farming equipment transactions, the Referee found that the clients were not provided with any sale or purchase contracts, leases, or any other separate writings evidencing the clients' right to use the equipment or the disposition of the equipment after the 2016 harvest season.
The Referee additionally found that neither respondent nor Hogan Willig fully disclosed to the clients and transmitted to them in writing the terms of the transactions involving the advances of funds or farming equipment in a manner that could be reasonably understood by the clients; the clients were not advised in writing of the desirability of seeking, or given a reasonable opportunity to seek, the advice of independent legal counsel in relation to the transactions; and neither respondent nor Hogan Willig requested or obtained from the clients informed consents, specifically in writings signed by them, to the essential terms of the transactions, respondent's role in the transactions, or respondent's or Hogan Willig's continued representation of the clients in view of the transactions.
The Referee found that, between May 2015 and July 2016, respondent arranged for Hogan Willig to take security interests in certain of the clients' property to secure the clients' indebtedness to respondent and Hogan Willig. The Referee found that, in May 2015, respondent caused to be filed with the Department of State a UCC financing statement listing the limited liability company of which the father and son are members (clients' LLC) as debtor and Hogan Willig as the secured party and specifying as collateral all crops, livestock, and farming products and supplies in possession of the clients' LLC. The Referee found that respondent also arranged for the clients to execute three collateral security mortgages listing Hogan Willig as mortgagee and the clients as mortgagor. The first mortgage was executed in June 2015 and secured indebtedness up to $100,000 for attorneys' fees incurred and disbursements made on behalf of the clients prior to and after the date of the mortgage. The second mortgage was executed in December 2015 and secured indebtedness up to $150,000 for attorneys' fees incurred and disbursements and "advances" made on behalf of the clients prior to and after the date of the mortgage. The third mortgage was executed in July 2016 and secured indebtedness up to $250,000 for attorneys' fees incurred and disbursements and "advances" made on behalf of the clients by Hogan Willig and respondent's LLC prior to and after the date of the mortgage. The Referee found that respondent arranged for the first two mortgages to be filed with the relevant county clerk in December 2015, and the third mortgage was filed in July 2016. The Referee found that, as a result of the UCC financing statement and mortgages, respondent and Hogan Willig became secured creditors and mortgagees of their clients while representing the clients in legal matters related to seeking refinancing for existing debt and defending against claims asserted by other creditors.
With respect to the UCC financing statement and three mortgages, the Referee found that respondent did not fully disclose to the clients and transmit to them in writing the terms of the transactions in a manner that could be reasonably understood by the clients; nor did respondent advise the clients in writing of the desirability of seeking, or give the clients a reasonable opportunity to seek, the advice of independent legal counsel in relation to the transactions; nor did respondent request or obtain from the clients informed consents, specifically in writings signed by them, to the essential terms of the transactions, respondent's role in the transactions, or respondent's or Hogan Willig's continued representation of the clients in view of the transactions.
The Referee found that, in or around May 2017, respondent and Hogan Willig recommended that the clients file for bankruptcy protection, but the clients rejected that recommendation and ceased communicating with respondent and Hogan Willig. The Referee found that, at that time, the clients' debts to creditors other than respondent and Hogan Willig totaled approximately $2,256,894, and that Hogan Willig's records indicate that the clients owed [*4]Hogan Willig and respondent's LLC for outstanding advances of funds in the approximate amount of $490,008, together with potential legal fees due to Hogan Willig in the approximate amount of $687,320. The Referee found that, following termination of the attorney-client relationship, neither respondent nor Hogan Willig has demanded payment or attempted to collect from the clients amounts potentially owed for attorneys' fees and the outstanding advances of funds, nor have the clients made any payments toward those amounts.
The Referee found, however, that in July 2019 respondent arranged to be filed with the county clerk discharges of the three mortgages, with each discharge being marked "paid," despite the fact that the clients had not paid the alleged indebtedness underlying the mortgages. In addition, in August 2019, respondent arranged to be filed with the Department of State a termination of the UCC financing statement, without consideration.
In addition to the factual and advisory findings set forth above, the Referee made an advisory finding that the affirmative defenses asserted in respondent's answer to the petition are factually unsupported by the record, are irrelevant to the allegations of misconduct, or constitute legal argument in opposition to the allegations of misconduct, rather than any defense that would preclude a finding of misconduct. With respect to mitigating factors, the Referee found, inter alia, that prior to or during the hearing respondent neither expressed remorse nor acknowledged wrongdoing in relation to his representation of the clients.
We confirm the factual findings of the Referee and conclude that respondent has violated the following Rules of Professional Conduct (22 NYCRR 1200.0):
rule 1.5 (b)—failing to communicate to a client within a reasonable period of time, with such communication made in writing where required by statute or court rule, the scope of the representation and the basis or rate of the fee for which the client will be responsible, including any changes thereto;
rule 1.7 (a) (2)—representing a client in a matter in which a reasonable lawyer would conclude that there is a significant risk that the lawyer's professional judgment on behalf of the client will be adversely affected by the lawyer's own financial, business, property or other personal interests, without obtaining from each affected client informed consent, confirmed in writing;
rule 1.8 (a)—entering into a business transaction with a client where he and the client have differing interests and the client expects him to exercise professional judgment for the protection of the client; and
rule 8.4 (h)—engaging in conduct that adversely reflects on his fitness as a lawyer.
We further conclude that respondent has violated 22 NYCRR 1215.1 by failing to provide to a client, within a reasonable period of time, a letter of engagement or retainer agreement setting forth an explanation of the scope of the legal services to be provided, as well as an explanation of the attorneys' fees to be charged, expenses, and billing practices, or an updated letter or agreement when there is a significant change in the scope of services or fee to be charged.
We have considered, in determining an appropriate sanction, the matters in mitigation submitted by respondent, including the statements contained in the affirmation, dated April 1, 2020, from respondent's proffered expert in the field of professional responsibility for lawyers, as well as respondent's statements that the clients suffered no harm, that the terms of the mortgages and advances of funds were fair and reasonable to the clients, and that respondent did not pursue his rights as a creditor of the clients. We have also considered various factors in aggravation of the misconduct, including that respondent, over the course of approximately two years, repeatedly failed to comply with client-protection provisions of the disciplinary rules cited above while engaged in numerous business transactions with his clients, which included three mortgages taken on real property owned by the clients, whereby respondent became a substantial lender and secured creditor of his financially vulnerable clients while representing them in legal matters concerning their existing debt and various claims of existing creditors. The record also establishes that, at or around the time the first advance of funds was made to or on behalf of the clients, certain attorneys employed by Hogan Willig discussed with respondent potential ethical concerns about providing such advances of funds, but respondent proceeded to make [*5]approximately 450 such advances without recognizing the applicable provisions of the Rules of Professional Conduct. We have also considered that the grievance history of respondent and Hogan Willig includes an admonition and four non-disciplinary letters of caution or advisement issued by the Grievance Committee between 1998 and 2018, with one of the non-disciplinary letters of caution, which was issued to respondent in 2007, arising from allegations that he improperly advanced financial assistance to a litigation client. Finally, we have considered respondent's failure to express remorse or sufficiently acknowledge his substantial disregard of his ethical obligations in relation to this matter. Accordingly, after consideration of all of the factors in this matter, we conclude that respondent should be suspended from the practice of law for a period of two years.